UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANGELIA MARIE JEFFORDS,

                    Plaintiff,

    v.                                           **DECISION AND ORDER**
                                                        11-CV-620S

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

      1.      Plaintiff, Angelia Marie Jeffords, challenges an Administrative Law Judge's ("ALJ") determination that she is not disabled within the meaning of the Social Security Act ("the Act"). Jeffords alleges that she has been disabled since January of 2007 due to headaches, dizziness, diabetes mellitus, and obesity and that these impairments render her unable to work. She therefore asserts that she is entitled to disability insurance benefits and supplemental security income (collectively "benefits") under the Act.

      2.      Jeffords filed an application for benefits under Titles II and XVI of the Act on July 23, 2007, alleging an inability to work since January 26, 2007[1] because of a stomach problem and Meniere's disease. The Commissioner of Social Security ("Commissioner") denied Jeffords' initial application and, as a result, she requested an administrative hearing. A hearing was held on July 22, 2009 before Administrative Law Judge ("ALJ") Robert T. Harvey, at which Jeffords appeared with counsel and testified. The ALJ considered the case *de novo*, and on September 28, 2009, he issued a decision denying

---

[1] Upon filing, Jeffords alleged a disability onset date of January 1, 2007, but later amended that date to January 26, 2007.

Jefford's application for benefits. Jeffords filed a request for review with the Appeals Council, but the Council denied her request on May 23, 2011. Jeffords filed the current civil action on July 21, 2011, challenging Defendant's final decision.[2]

3. On December 22, 2011, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Jeffords followed suit by filing her own motion for judgment on the pleadings on January 25, 2012. Briefing on the motions concluded on March 26, 2012, at which time this Court took the motions under advisement without oral argument. For the reasons set forth below, the Commissioner's motion is denied, Jeffords' motion is granted, and this case is remanded.

4. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that which amounts to "more than a mere scintilla"; it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5. "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the

---

[2] The ALJ's September 28, 2009 decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Act. See 20 C.F.R. §§ 404.1520, 416.920. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

7. This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the

> [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8. Although the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n. 5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). The final step of this inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9. In this case, the ALJ made the following findings with regard to the five-step process set forth above: (1) although Jeffords' earnings were close to the substantial gainful level in 2007, she would be given the benefit of the doubt and the ALJ would proceed to the next step (R. 15);[3] (2) Jeffords has four severe impairments: headaches, dizziness, diabetes mellitus, and obesity (id.); (3) Jeffords does not have an impairment or combination of impairments that meets or medically equals the criteria necessary for finding a disabling impairment under the regulations (id. 16); (4) Jeffords has the residual functional capacity ("RFC") to lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently, sit 2 hours in an 8 hour day and stand/walk 6 hours in an 8 hour day, cannot

---

[3]Citations to the underlying administrative record are designated as "R."

work in areas with unprotected heights, around heavy, moving or dangerous machinery, climb ropes, ladders or scaffolds, or work in areas where she would be exposed to excessive bright lights or loud noises, and has occasional limitations in the ability to bend, climb, stoop, squat, kneel and balance (id. 16-20); and (5) considering Jeffords' age, education, work experience, and RFC, there are jobs in significant numbers in the national economy that she can perform (id. 20-21).  Ultimately, the ALJ concluded that Jeffords was not under a disability as defined by the Act from January 1, 2007 through September 28, 2009, the date of the ALJ's decision. (R. 21.)

10. Jeffords contends the ALJ's decision is not supported by substantial evidence, and raises five challenges in this regard.  She argues, first, that the ALJ should have included her depression and anxiety among her severe impairments; second, the ALJ failed to perform a function by function assessment of her RFC; third, the ALJ erred in failing to solicit vocational expert testimony; fourth, the ALJ did not properly assess her subjective complaints; and fifth, the ALJ erred in failing to consider a closed period of benefits.

11. According to Jeffords, the ALJ incorrectly determined that her depression did not constitute a severe impairment.  She urges that the record confirms she was being treated for depression, and her neurologist, Dr. Smith, noted that her depression could contribute to the severity of the headaches for which he was treating her.  She further suggests that a consultative psychological assessment was required under 20 CFR § 404.1519a.  And, finally, Jeffords argues that the ALJ erred in reaching his step two determination because no functional assessments support his conclusion.

12. At step two of the evaluative process, an ALJ must determine whether an

impairment significantly "limits a claimant's ability to do 'basic work activities.'" Gray v. Astrue, No. 04 Civ. 3736, 2009 U.S. Dist. LEXIS 47584, 2009 WL 1598798, at *5 (S.D.N.Y. June 8, 2009) (quoting 20 C.F.R. § 416.921).  "An impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to perform basic work activities." Ahern v. Astrue, No. 09-CV-5543 (JFB), 2011 U.S. Dist. LEXIS 30745, 2011 WL 1113534, at *8 (E.D.N.Y. Mar. 24, 2011) (citing 20 C.F.R. § 404.1521). In making this determination, an ALJ may "rely on what the [medical] record says, but also on what it does not say." Johnson v. Astrue, No. 09 Civ. 6017(RMB)(JCF), 2010 U.S. Dist. LEXIS 139423, 2010 WL 5573632, at *11 (S.D.N.Y. Dec. 3, 2010) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)).

       13.     Here, the ALJ found that Jeffords had four severe impairments.  While the ALJ did note in his decision that Jeffords was, in addition, being treated for depression and anxiety, he observed that her treating source reported that she was doing well with medication, and that an MRI of the brain was "essentially negative."  (R. 17-18.)  In assessing this diagnosis, the ALJ relied on treatment records from Elm Street Family Practice, which include the following detailed information relative to Jefford's depression. Jeffords first sought treatment for depression and anxiety on January 29, 2007.  At that time she reported that her son was going to jail, her husband lost his job, she had no insurance, and was crying all of the time.  She was prescribed Paxil. (R. 168.)  One week later, on February 5, 2007, Jeffords reported she was crying less and starting to feel better, but was very tired and a little shaky.  (R. 17, 166.)  By February 28, 2007, her tremor was better, her fatigue and depression were improving, and she was feeling much better.  (R.

165.) On May 29, 2007, she was doing well with her medications and experiencing no side effects, but had forgotten to take her Paxil for a couple of days and developed some dizziness. (R. 17, 163.) On September 5, 2007, Jeffords reported that her depression was better, but she felt she was sleeping all the time. Her medical provider switched her medication from Paxil to Effexor. (R. 270.) On September 24, 2007, her depression was improving and she felt less tired. (R. 269.) After going off her antidepressant for about a week at the direction of another physician, Jeffords felt anxious and blue. Her physicians consulted, agreed she would restart her Effexor, and she again reported doing well with no side effects. (R. 265-66.) In May 2008, Jeffords noted she has a son with drug and alcohol addictions who was going to rehab. She reported an increase in stress and depression and thought her medication was no longer helping. An increased dosage of Effexor was prescribed. (R. 262.) In July 2008, her depression and anxiety were stable (R. 259), and, in October 2008, it was noted her depression has been good (R. 256). Through May 19, 2009, Jeffords' depression either remained stable, or was returned to stable through medication adjustments. (R. 376-78.) Having reviewed the pertinent parts of the record and the ALJ's reasoning, this Court is persuaded that no error was committed when the ALJ concluded that depression was not a severe impairment.

14. Jeffords' further step-two arguments—that a consultative psychological assessment was required under 20 CFR § 404.1519a, and the functional assessments in the record do not support the ALJ's conclusion —also are unavailing. The regulations provide that an examination may be required to resolve an inconsistency in the evidence or where the evidence is insufficient. 20 CFR § 404.1519a(b). Jeffords argues, based on medical and mental functional assessments in the record, that such inconsistencies exist here. She first points to the opinion of Dr. Pathak, who indicated she could handle only low

stress jobs. Dr. Pathak reported that he had seen Jeffords for Meniere's disease on two occasions—once in 2002 and again in 2007. (R. 242-46  The ALJ give little weight to Pathak's assessment due to the lack of a treatment history and the speculative nature of his opinion. (R. 18.) In addition, this Court notes that Pathak's opinion related solely to the effect of Jeffords' Meniere's disease; he did not mention depression at all.  Jeffords also relies on Nurse Practitioner Betker's assessment that, due to her depression, she had limited ability or no ability to do work-related activities. (R. 418-19.) Betker treated Jeffords at Elm Street Family Practice.  The ALJ gave little weight to this opinion because Betker assigned significant limitations to Jeffords' functioning, yet concluded she was not disabled. (R. 19.)  This Court also notes that the severe limitations assigned are at odds with Betker's own treatment notes.  Dr. Smith's assessment did not identify depression or anxiety as a trigger for or symptom of the headaches and dizziness for which he was treating Jeffords.  (R. 412-13.)  Because the assessments to which Jeffords refers do not contain inconsistent objective medical evidence, no examination was required and the ALJ did not err in determining that Jeffords' depression was not a severe impairment.

15. Jeffords' second and fourth challenges relate to the adequacy of the step four residual functional capacity determination.  She contends the ALJ's RFC is not supported by the record, which establishes a much more limited ability to function, and also that the ALJ did not properly assess her credibility with regard to her subjective complaints. (Docket Nos. 11-1 at 8-10, 11-13).

16. "The Commissioner defines RFC as a claimant's 'maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . 8 hours a day, for 5 days a week, or [on] an equivalent work schedule.'" Sorensen v. Comm'r of Soc. Sec., No. 3:06 Civ. 554, 2010 WL 60321, at *8 (N.D.N.Y. Jan. 7, 2010)

(quoting SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996)[4] ). In assessing a claimant's RFC, the ALJ "must include a discussion of the individual's abilities on that basis." SSR 96-8p, 1996 WL 3714184, at *2. Nonexertional capacity . . . assesses an individual's abilities to perform physical activities [that do not depend on physical strength] such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision)." Id. at *3.

17. As previously noted, the ALJ concluded that Jeffords' headaches, dizziness, diabetes mellitus, and obesity cause significant limitation in her ability to perform basic work activities. In a lengthy RFC determination, Jeffords' was determined to have the capacity to lift or carry 20 pounds occasionally and 10 pounds frequently, to sit for two hours in an 8 hour workday, and to stand or walk for 6 hours in an 8 hour work day. The ALJ went on to list a variety of specific constant and occasional limitations. Jeffords appears to take issue with the ALJ's implicit conclusion that her limitations do not prevent her from performing sustained work activities on a full-time work schedule. She suggests that this conclusion is not supported by substantial evidence, specifically with regard to her headaches and vertigo.

18. In this regard, the ALJ gave significant weight to the opinions/records of Drs. Sakr and Smith. Dr. Sakr, who appears to have been a treating physician, stated, in a one-page letter, that Jeffords "has chronic vertigo and chronic bilateral hearing loss of seven years duration." (R. 247.) There are neither treatment records nor an RFC from Dr. Sakr.

---

[4] Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, 1996 SSR LEXIS 5.

Dr. Sakr referred Jeffords to Dr. Smith for a neurological consultation. The administrative record includes treatment records from Dr. Smith, which appear to be complete. Those records note that Jeffords experienced headaches one to four times per week, the headaches had a strong migrainous character, and dizziness occurred as a migraine concomitant. (R. 343-46.) On first examining Jeffords, Dr. Smith noted that she had lost her bus-driving job after experiencing an episode of vertigo while driving, and was now at home with no significant stress. (R. 388-89.) Dr. Smith prescribed various medications and dosages, some of which Jeffords reported lessened her symptoms. (R. 392-404.) His records do not contain any impressions as to her functional capacity. The ALJ gave "great weight" to these records. (R. 19.) Dr. Smith did return an RFC questionnaire in which he stated that Jeffords has headaches that can be triggered by bright lights and lack of sleep and are likely to produce "good days" and "bad days." But, he did not respond to 18 of the 25 questions presented, and gave no information as to the severity, frequency or approximate duration of Jeffords' headaches, the associated symptoms, what factors can make the symptoms better or worse, objective indications of the condition, related impairments, her response to treatment, her ability to perform basic work activities, her estimated absences from work due to headaches, the likelihood that the headaches would require her to take unscheduled breaks, and her ability to tolerate work stress. (R. 411-16.) The ALJ simply noted that "Dr. Smith completed a [RFC] Questionnaire;" he did not state what weight, if any, was accorded the RFC.

Nurse Practitioner Bekter also submitted an RFC questionnaire relative to Jeffords' vertigo/dizziness. She stated Jeffords experiences vertigo with nausea and vomiting, the episodes occur from days apart to sometimes weeks apart and can be precipitated by sudden movement, an episode can last from moments to days, lying still can make the

10

symptoms better, Jeffords is precluded from performing basic work activities during an attack, she can tolerate only moderate work stress, and anticipated absences from work would vary, but in Bekter's opinion would occur about 4 days per month. (R. 237-41.) The ALJ gave little weight to this opinion, concluding that it was "too speculative to accept." (R. 18.)

Finally, the record also includes a Medical Source Statement of Ability to do Work-Related Activities [MSS] prepared by Dr. Boehlert, a consultative examiner who reviewed the record and examined Jeffords. Upon examination, Dr. Boehlert found no chronic, long-term limitations. (R. 424.) In the MSS, however, she assigned numerous limitations to Jeffords, including lifting limitations, limitations on sitting without interruption and standing and walking in a work day, never climbing ladders or stooping, never being exposed to unprotected heights or moving mechanical parts, and only occasionally able to perform a variety of postural activities or be exposed to a variety of workplace conditions. (R. 426-32.) The ALJ assigned this opinion little weight, stating that the finding of no chronic limitations, followed by the assignment of significant limitations, was contradictory. (R. 19.) Nevertheless, the ALJ proceeded to set out limitations generally consistent with those described by Dr. Boehlert. (R. 16.)

19. There is no indication that the ALJ's RFC assessment is based on any source he found persuasive. The record is devoid of an opinion from either Dr. Sakr or Dr. Smith concerning Jeffords' RFC—the degree to which her impairments would prevent her from working. The record includes only a one-page letter from Dr. Sakr, Dr. Smith's records do not include any discussion of physical or mental limitations and their impact, and Dr. Smith's RFC, which the ALJ may or may not have relied on, provides diagnostic information only. This is important because the ALJ granted "little weight" to the only

treating source to provide a completed RFC—Nurse Practitioner Betker. In light of these circumstances, this Court is unable to determine what evidence the ALJ relied on in reaching his assessment as to Jeffords' ability to perform basic work activities 8 hours a day, five days a week, or on an equivalent schedule.

20. An ALJ has an obligation to develop the administrative record, including, in certain circumstances, re-contacting a source of claimant's medical evidence to obtain additional information. Lukose v. Astrue, 09-CV-962, 2011 U.S. Dist. LEXIS 125497, at *9 (W.D.N.Y. Oct. 31, 2011.) This duty exists regardless of whether the plaintiff has counsel or is continuing *pro se*. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (duty satisfied where report from treating physician discussed plaintiff's ability to perform past relevant work an other sedentary work).

The caselaw in this Circuit is clear; courts consistently have held that if the record does not contain an RFC or MSS from a plaintiff's treating physician or any other report assessing the plaintiff's ability to work, the ALJ has a duty to attempt to obtain such assessment. *See* Pitcher v. Astrue, No. 06-CV-1395, 2009 U.S. Dist. LEXIS 68946, at *41 (N.D.N.Y. 2009) (an MSS or RFC from the treating physician was important because the ALJ granted other treating source's MSS only "moderate weight," and the only other individual to assess plaintiff's RFC was a disability analyst). Indeed, the regulations provide that, "[t]he Commissioner should request an MSS from the claimant's treating physician if such a statement has not been provided." Outley v. Astrue, 09-CV-041, 2010 U.S. Dist. LEXIS 95336, at *11-12 (N.D.N.Y. Aug. 26, 2010) (citing 20 C.F.R. § 416.912(d) (explaining that the Commissioner will "make every reasonable effort to help you get medical reports from your own medical sources, a medical report should include an MSS")).

Decisions involving the ALJ's duty to obtain an RFC or MSS frequently cite to Judge Spatt's explanation in Peed v. Sullivan:

> What is valuable about the perspective of the treating physician—what distinguishes him from the examining physician and from the ALJ—is his opportunity to develop an informed opinion as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician.

778 F.Supp. 1241, 1246 (E.D.N.Y.1991). "Although the regulation provides that the lack of such a statement will not render a report incomplete, it nevertheless promises that the Commissioner will request one." Johnson v. Astrue, 811 F. Supp. 2d 618, 629 (E.D.N.Y.2011) (citation omitted). And, the ALJ must request such a statement regardless of whether the record contains a complete medical history. Id. (citing § 404.1513(b)(6)). Where, as here, the ALJ's decision gives great weight to and relies on records, reports, or opinions that themselves do not include any discussion of the plaintiff's limitations and ability to perform work-related activities, reversal and remand for additional proceedings is warranted. See Rivera v. Barnhart, 379 F. Supp. 2d 599, 608 (S.D.N.Y. 2005).

21. Having found remand necessary, this Court does not reach Jeffords' additional arguments that the ALJ did not properly assess her subjective complaints, erred in failing to solicit vocational expert testimony, and erred in failing to consider a closed period of benefits.

22. Upon careful examination of the administrative record, this Court finds that it cannot evaluate whether the ALJ's decision was supported by substantial evidence. The ALJ has not clearly explained how he arrived at his RFC assessment where none of the physician's whose opinions he favored provided any information as to the limitations


themselves or the impact on Jeffords' ability to work.  On remand, the ALJ should explicitly identify the information relied upon after attempting to supplement the record, if necessary.

* * * *

IT HEREBY IS ORDERED, that Defendant's Motion for Judgment on the Pleadings (Docket No. 8) is DENIED;

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 11) is GRANTED;

FURTHER, that the decision of the ALJ is REVERSED and this matter be REMANDED to the Commissioner of Social Security for further proceedings consistent with the above;

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

Dated:   September 3, 2012
         Buffalo, New York

                                             /s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                                 Chief Judge
                                           United States District Court